MELTON et ux. v. MELTON.

No. 30075. March 16, 1943.

*135 P. 2d 43.*

Hatcher & Bond, of Chickasha, for plaintiffs in error.

Jeff H. Williams and Melton, McElroy & Vaughn, all of Chickasha, for defendant in error.

BAYLESS, J. C. F. Melton appeals from a judgment of the district court of Grady county in favor of W. E. Melton. C. F. Melton and wife filed an action seeking equitable relief, and the case was tried to the court without a jury. The purpose of the action was

to cancel a warranty deed, a contract, and a bill of sale executed by his mother conveying real estate and personal property to his brother, W. E. Melton. C. F. Melton is referred to in the record as Frank, and W. E. Melton is referred to as Willie. Frank set up as grounds for cancellation: (1) false and fraudulent representations, (2) undue influence, and (3) mental incapacity of the mother. In Frank's brief the only issue presented is that the judgment denying him relief is contrary to the clear weight of the evidence and is contrary to law.

The parties do not differ about the law. They do not differ about the legal definition and effect of false representation. They agree they are bound by our statutory definition of undue influence. 15 O. S. 1941 § 61. Their only difference about the law of undue influence involves the decisions that each side relies on to sustain the argument about the weight of the evidence.

The action being equitable in nature, and the appeal likewise, it is our duty to review the evidence and weigh the same; but we are not authorized to reach a different result unless we can say the judgment is clearly against the weight of the evidence.

The evidence shows without contradiction that Mrs. Lula Melton was a widow, was the owner of the property involved, was the mother of these sons, seemed to love each of them equally, had been in ill health for two years or more before her death; that during all of that time she had discussed the disposition of her affairs for the benefit of her sons in contemplation of death, had executed a will, had been much worse for some weeks prior to her death, had suffered almost constantly and had to be eased regularly by opiates, and a few days before her death she executed the writings now sought to be avoided.

Also, it is not disputed that she was considerably in debt, and, although at least two calculations respecting her assets and liabilities appear, it is reasonably certain that her debts nearly equaled, if they did not exceed, one-half of the value of her assets.

Frank is shown by the evidence to have suffered for several years from some physical disability that prevented his working regularly, and his financial situation differed materially from that of Willie, who is shown to have been a fairly successful business man. There is evidence that some weeks before the death of the mother, Frank had suffered from a nervous or mental flare-up, and he was committed to an asylum for a short period. However, he had been released prior to the death of the mother and there is no contention here that he has since suffered any mental incapacity.

The proof shows that prior to the period of time involved herein Frank had suffered a judgment to be taken against him on May 14, 1932, for $793.20, with interest at 10%, $75 attorney's fee, and court cost. Frank's contention is that Willie falsely represented to his mother, in 1939, when she executed these papers, that this judgment amounted to $2,500, and that the judgment creditor would seize Frank's inheritance as soon as it vested. The mother knew of this judgment, and commented to witnesses that Frank's home was safe from it because the title thereto was in his wife's name. The evidence is conflicting on whether Willie told her that the judgment was $2,500, but it is reasonably clear that that was the figure she had in mind. In 1939, this judgment approximated $1,500, and was apparently uncollectible unless Frank inherited something from his mother. To the extent that anyone represented to the mother that the judgment exceeded approximately the figure of $1,500, the representation was untrue. But it was no false representation to tell her that the holder intended to seize Frank's inheritance to satisfy the judgment.

The evidence is uncontradicted that the mother talked to more than one person of her desires to dispose of her property in a manner to protect Frank.

From the evidence it is seen that both

sons had equal opportunity to see her, and be with her, and she did not prefer one over the other in her conversations with others. She lived with Frank more than with Willie.

She consulted with her banker, and at his advice consulted with a lawyer (one she had not used before) and discussed the matter of the disposition of her property with her brother and nephew. The evidence is in hopeless conflict as to who did what the last few days of her life, and especially regarding the execution of these papers. We do observe, however, that Frank had nothing to do therewith. If Frank's evidence is to be believed wholly, and certain inferences drawn therefrom, Willie had the opportunity to and did advise his mother to do what she did against her desire and better judgment and to Frank's detriment. If Willie's evidence is to be believed, his mother consulted with him, but she acted upon the composite advice of several in doing what she did, and he did not persuade her against her will, but only consented to do as she wished as directed and expressed in the papers she executed. Willie insists that the arrangements made by the mother, contained in the papers she executed, were fair to Frank, and protected him from his creditor, and were not made by his mother as the result of any undue influence or false or fraudulent representations on his part.

The mother conveyed her real estate and personal property to Willie, and in a separate contract, as an expressed consideration for these conveyances to him, Willie agreed (1) to support and maintain the mother for the remainder of her life; (2) to pay to Frank $30 per month while Frank was not confined in any institution until $3,600 had been paid, the payments to cease upon Frank's death if the $3,600 had not been paid at that time; and to secure the payment of these sums to Frank, in the event of Willie's predeceasing Frank, by an endorsement upon a policy of insurance on Willie's life then naming the mother beneficiary; and (3) to assume and pay the debts of the mother.

Frank says this arrangement was grossly unfair to him because (1) the obligation to support his mother was illusory in view of her imminently expected death; and (2) that $3,600 did not represent a fair division of the mother's property. We accord some merit to the first contention. As to the second contention, we have heretofore alluded to the relation of the mother's debts to her assets, and we are not impressed with the contention that $3,600 is a grossly disproportionate sum when contrasted to Frank's expectancy subject to seizure and sale by his creditor. Also, the record is full of evidence that the mother did not like Frank's wife, and was particularly anxious that Frank's wife receive no part of the estate.

We cannot escape the conclusion that Willie could exert an influence on his mother, and that he had an opportunity to advise with her about the papers executed. But Frank's evidence falls short of showing (1) that Willie actually unduly influenced the mother, and (2) by means of false and fraudulent representations. As said in Cotcha v. Ferguson, 165 Okla. 295, 25 P. 2d 767:

"To set aside any transaction on the ground of undue influence, it must be shown, not only that such influence existed and that it was exercised, but also that it was exercised effectively; that is, that it was the efficient cause in bringing about the transaction complained of."

For the reasons expressed herein, we are unable to say that the judgment of the trial court is clearly against the weight of the evidence, and therefore the judgment must be affirmed on this aspect of the case.

We have considered the evidence about the mental incapacity. It was agreed that this woman had been a person of exceptional intellect. All of the witnesses agreed that the effects of her prolonged illness had affected her mind to an extent, and the medical testimony was that the narcotics given affected her mind to an extent. She was

in almost constant pain. But we observe that the medical expert was not asked to say whether she lacked mental capacity to execute the papers, and the extent of his testimony was he would not advise his patients to execute papers while under the influence of narcotics. We are unwilling to say that the trial judge's decision on this aspect of the case is clearly against the weight of the evidence.

The judgment appealed from is affirmed.

CORN, C. J., GIBSON, V. C. J., and WELCH, HURST, DAVISON, and ARNOLD, JJ., concur. RILEY and OSBORN, JJ., absent.